# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>VY PHAM, a/k/a/ "msvy_crypto,"<br><br>Defendant. | Civil Action No. 24-CV-____(___)<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission" or "SEC"), alleges the following against the defendant, Vy Pham, a/k/a/ "msvy_crypto":

## SUMMARY

1.      This action arises from Defendant Vy Pham's unregistered offers and sales of two crypto assets as securities, and from her schemes to manipulate the market for those securities.

2.      In the spring of 2021, Pham participated in the launch of "Saitama Inu" ("Saitama")—a crypto asset that was offered and sold as a security.  Pham and other individuals led a project to increase the value of Saitama.  They claimed that the token would create wealth for investors through passive income and would supposedly promote financial literacy and global financial well-being.  They then manipulated the price and trading volume of that crypto asset through coordinated purchases designed to lure in new investors by creating the illusion of growing market interest in Saitama.  Pham's involvement in the Saitama project was short lived, however.  Soon after pumping up the price and trading volume of Saitama through manipulative trading, she had a falling out with other members of Saitama's leadership team, sold her Saitama

holdings, and left the project in the summer of 2021.  Other leaders of the Saitama project

continued without her and have been charged with numerous violations of the federal securities

laws.  *See SEC v. Russell Armand et al*. (D. Mass. 2024).

3.       Later in 2021, Pham launched a different crypto asset called the "Robo Inu

Finance token" ("Robo Inu")—a token "inspired by NASA's ambitious plan to launch Robo-

dogs to Mars."  Pham once again promised investors that she would build a fintech "ecosystem"

designed to "maximize value" for the holders of Robo Inu.

4.       Upon offering Robo Inu to the investing public, Pham and others at her behest

worked to create active secondary markets on which Robo Inu could be traded.  But there was

little natural market interest in Robo Inu.  So Pham hired Gotbit Consulting LLC ("Gotbit") to

engage in manipulative trading on her behalf.  Gotbit, which purports to provide "market

making" services to crypto asset projects, generated millions of dollars in artificial daily trading

volume by trading Robo Inu with itself and, in the process, creating the illusion of public interest

and enthusiasm for Robo Inu.  The purpose of this self-trading, also known as "wash trading,"

was to induce the purchase of Robo Inu by the investing public.

5.       This manipulation campaign ran from February 2022 through at least June 2023.

While Gotbit was artificially inflating Robo Inu's trading volume, Pham and other leaders of the

Robo Inu project promoted Robo Inu to the investing public through social media and other

public communication channels, including X (formerly Twitter), YouTube, Reddit, and the

publishing platform Medium, along with a website and a whitepaper describing Robo Inu and the

efforts of Pham and others to create an ecosystem of applications that would generate value for

Robo Inu holders.

6.      Pham offered and sold both Saitama and Robo Inu to the investing public as securities.  She was therefore required to register those offers and sales with the SEC unless an exemption from registration was available.  Pham did not file a registration statement with the SEC for those offers or sales, and no exemption from registration was available.

7.      Moreover, Pham's conduct has caused significant harm—to the integrity of the markets and to the investor victims who traded in crypto assets fraudulently lured by the fake volumes and prices that she procured.

## **VIOLATIONS**

8.      As a result of the conduct alleged herein, Pham violated, and unless restrained and enjoined will continue to violate, Sections 5(a), 5(c), 17(a)(1), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c), and 77q(a)(1) and (a)(3)], Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(2) and 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## **RELIEF SOUGHT**

9.      The Commission seeks permanent injunctions against Pham, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest pursuant to Sections 21(d)(5) and (7) of the Exchange Act [15 U.S.C. § 78u(d)(5) and (7)]; civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; an order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] barring Pham from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is

required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and an order prohibiting Pham from participating, directly or indirectly, including but not limited to through any entity controlled by her, in any offering of securities, including any crypto asset security, provided however, that such injunction shall not prevent her from purchasing or selling securities, including crypto asset securities, for her personal account; and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

11.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the District of Massachusetts, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. Specifically, the Defendant offered securities to individuals who reside in the District, and promoted those securities to individuals residing in the District via social media and other communications platforms.

## DEFENDANT

12.     Vy Pham is a citizen of Vietnam and resides in Los Angeles, California.  At all relevant times, she has held herself out publicly as the leader of the project related to Robo Inu and as a founder and Chief Executive Officer of Robo Global Investment PTE, Ltd.

## RELATED INDIVIDUALS AND ENTITIES

13.     Russell Armand, a/k/a "Saitamaguru1," 42, resides in Texas.  At all relevant times, Armand was the Chief Executive Officer of the Saitama project.

14.     Maxwell Hernandez, a/k/a "MaxEquation," 36, resides in Massachusetts.  At all relevant times, Hernandez was the Chief Technology Officer of the Saitama project.

15.     Manpreet Singh Kohli, a/k/a "Mkay Saitama," a/k/a "mannythehitman," 39, resides in India and London, England.  At all relevant times, Kohli was the Chief Financial Officer of the Saitama project.

16.     Nam Tran, a/k/a "Ntran1234," 49, is believed to reside in Washington.  At all relevant times, Tran was the Chief Business Officer of the Saitama project.

17.     The Commission has charged Armand, Hernandez, Kohli, and Tran with federal securities law violations in a separate complaint.  *See SEC v. Russell Armand et al*. (D. Mass. 2024).  They are referred to herein as the "Saitama Defendants."  With Pham and Individual 1 (the Saitama CMO), they are collectively referred to as the leaders of the Saitama project.

18.     Robo Global Investment PTE, Ltd. ("Robo Global") is a limited company that was founded by Pham and was organized in Singapore in 2022.  Per its website, Robo Global purportedly "aspires to create an open ecosystem where anyone . . . can gain financial freedom" through the development of the Robo Inu token and related applications.

19.     Gotbit Consulting LLC, a/k/a Gotbit Hedge Fund, ("Gotbit") is a limited liability company registered under the laws of Belize, with a registered office in Belize City, Belize.  Gotbit was founded in or around 2017 and purports to have offices in Armenia, Portugal, Turkey, Vietnam, the United Arab Emirates, and the United Kingdom.

20.     Fedor Kedrov is believed to reside in Russia.  According to his LinkedIn profile,

Kedrov is Gotbit's Chief Operating Officer.  Gotbit's website states that Kedrov is also the "Director of [the] Market Making Department."

21.     The Commission has charged Gotbit and Kedrov with securities fraud in a separate complaint.  *See SEC v. Gotbit Consulting LLC et al*. (D. Mass. 2024).

22.     "Individual 1," 36, resides in Texas.  Individual 1 was the Chief Marketing Officer of the Saitama project (the "Saitama CMO").

23.     "Individual 2" resides in Australia and worked with Pham to manipulate the market for Robo Inu.

24.     An individual who identifies himself in private chats on the encrypted messaging platform Telegram as "Vladislav Trader" works for Gotbit.

25.     An individual who identifies himself on Telegram as "Vladimir" works for Gotbit.

26.     An individual who identifies himself on Telegram as "Kavi JLL" works for Gotbit.

## REGULATORY BACKGROUND

27.      As the Supreme Court has recently reemphasized, the Securities Act and the Exchange Act "form the backbone of American securities law."  *Slack Tech., LLC v. Pirani*, 598 U.S. 759, 762 (2023).  Together, these Acts provide for the regulation of various activities in the markets for securities and define "security" broadly to include a wide range of assets, including "investment contracts."  Securities Act § 2(a)(1) [15 U.S.C. § 77b(a)(1)]; Exchange Act § 3(a)(10) [15 U.S.C. § 78c(a)(10)].

28.     Congress enacted the Exchange Act in part to provide for the regulation of the national securities markets.  Congress created the SEC and charged it with protecting investors,

preserving fair and orderly markets, and facilitating capital formation.  In keeping with Congress' goals, these Acts contain broad anti-fraud and anti-manipulation prohibitions.

29.     Sections 5(a) and 5(c) of the Securities Act generally require an issuer of securities to register an offering of securities through an effective registration statement before the securities are offered and sold to the public.  *See* 15 U.S.C. §§ 77e(a) and (c).  Registration statements for a securities offering provide public investors with material information about the issuer and the securities to be offered and sold.

30.     Over seventy years ago, the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), set forth the relevant test for determining whether an instrument is an investment contract subject to regulation under U.S. securities laws.

31.     Investment contracts are transactions, contracts, or schemes through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others.

32.     Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *Id.* at 299.

## BACKGROUND ON CRYPTO ASSETS

33.     As used herein, the terms "crypto asset" or "token" generally refer to an asset issued and/or transferred using blockchain or distributed ledger technology, including assets referred to colloquially as a "digital asset," "cryptocurrency," "virtual currency," and digital "coin."

34.     A blockchain or distributed ledger is a database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data

packages, referred to as "blocks."  The system relies on cryptographic techniques for secure recording of transactions.

35.     The Ethereum blockchain is an example of a blockchain.  Ether (or "ETH") is the Ethereum blockchain's native token.  (Some crypto assets may be "native tokens" to a particular blockchain—meaning that they are represented on their own blockchain, though other crypto assets may also be represented on that same blockchain, as is the case with the Ethereum blockchain.)

36.     ERC-20 is a standard protocol (or technical specification of the type of crypto token) currently used on the Ethereum blockchain to create and represent tokens on that blockchain.

37.     A crypto asset "wallet" is hardware or software that enables users to store private keys, which function like passwords that are used to access and transfer crypto assets.

38.     Crypto asset trading platforms allow their customers to purchase and sell crypto assets for fiat currency (legal tender issued by a country) or for other crypto assets, depending on the platform.  "Off-chain" transactions are tracked in the internal recordkeeping mechanisms of the platform but do not involve transferring crypto assets from one wallet to another, while "on-chain" transactions are those involving the transfer of a crypto asset from one blockchain address to another.

39.     On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:  The DAO*, advising "those who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto assets at issue in that report involved investment contracts and thus securities.

## BACKGROUND ON MARKET MAKERS

40. "Market makers" are in the business of buying securities from those who wish to sell, and selling securities to those who wish to buy, and operate in many traditional securities markets. Market makers "make markets" by continuously and publicly quoting both a price at which they are willing to buy a security (the "bid") and a higher price at which they are willing to sell the security (the "ask"). The difference between these prices is known as the "bid-ask spread," (or just "the spread") and is one of the ways market makers earn money through both buying and selling—i.e., "making a market" for—securities.

41. Market makers can affect the liquidity, depth, and efficiency of markets by ensuring that there is always a counterparty willing to transact with buyers and sellers at publicly quoted prices. This is especially the case for thinly traded securities, where there may be few "natural" (or "organic") buyers and sellers in the market. A market maker can provide liquidity to a seller of a security when it is difficult to find a natural buyer, or to a buyer of a security when it is difficult to find a natural seller.

42. In traditional securities markets, trading platforms such as national securities exchanges frequently offer incentives for market makers to provide real liquidity to traders on the platform, even for illiquid securities and during periods of market stress.

43. In traditional securities markets, market makers and other market participants are regulated with a view toward promoting benefits to the overall market and deterring any conflicts of interest or unfair trading advantages. Market makers are subject to requirements regarding registration, capital, trade reporting, and business conduct standards, among other things. By contrast, self-described market makers operating on unregistered crypto asset trading platforms do not adhere to these requirements. In such an environment and in the absence of regulatory

compliance and its concomitant oversight, market makers have ample opportunities to act on powerful incentives to manipulate a token's price and/or trading volume.

44.     For example, unlike in the traditional, regulatorily compliant markets, in the crypto asset markets it is often the token offeror who pays these market makers a monthly fee, and they may pay these fees for artificially inflating trading volumes to create the false impression that there is a robust market for what is in reality a thinly traded crypto asset.  A market maker might accomplish this by using one or more accounts it directly or indirectly controls to trade against its own quotation.  Here, there is no change in beneficial ownership of the asset traded but the appearance of a market-driven transaction.  This phenomenon is known as "wash trading."

45.     Similarly, the token offeror might seek to have one or more market makers create artificial volume to meet minimum requirements for having their crypto asset made available on one or more crypto asset trading platforms.  This would give the crypto asset greater prominence and potentially could attract more natural buyers and sellers.

46.     Manipulative trading can benefit both the offeror and the market maker at the expense of natural investors; each has incentives to generate public interest in the token so that they can liquidate their token supplies at higher prices—particularly if the crypto asset's offerors and their affiliates have retained large portions of the assets at inception (as is common in the crypto asset markets), which they cannot monetize absent demand from natural buyers.

## FACTS

## SAITAMA

47.     The Saitama token is an ERC-20 standard token on the Ethereum blockchain.

48.     No later than June 2021, the leaders of the Saitama project published a website

and a whitepaper in which they described Saitama as a "platform that promotes global financial wellbeing by empowering the youth to be in control of their money and create their own wealth opportunities."[1]

49.     According to the whitepaper, the Saitama project leaders would build an "ecosystem" of products and services specifically built for Saitama, including:

> a.  a smart wallet application called "SaitaMask," which the Saitama project leaders described in the whitepaper as "a safe and smart wallet that will allow the community to store their digital assets like $SAITAMA and learn about finance and investment opportunities";
>
> b.  a marketplace called "SaitaMarket" in which individuals could "use $Saitama and other partner tokens to purchase goods and services";
>
> c.  a platform for creating and trading so-called non-fungible tokens ("NFTs") called "SaitaMaker" in which users could "create, launch and promote projects based on the $SAITAMA monetary system"; and
>
> d.  a "multi-channel content platform" called "Saitama Edutainment" that would educate young investors "on how to save, invest, manage money and create wealth opportunities while entertaining our audience."

## I.     Pham Engaged in Unregistered Offers and Sales of Saitama.

50.     Pham offered and sold Saitama as a security, specifically as an investment contract, on numerous crypto asset trading platforms.

51.     *First*, Saitama purchasers, including those who bought it on crypto asset trading

---

[1]  According to the Saitama whitepaper, the Saitama "brand and token name took inspiration from the legend of a mysterious 'ghost dog' that is said to be roaming the mountains in the region of Saitama in Japan" and is revered as "a guardian against misfortune."

platforms, invested money—specifically U.S. dollars, Bitcoin, or ETH—when they purchased Saitama.

52.    *Second*, all Saitama purchasers invested in a common enterprise with each other and with the Saitama project leaders, who at all relevant times retained significant Saitama holdings.  Because the value of Saitama rose or fell together for all holders, all Saitama holders profited or suffered losses equally in amounts proportionate to their Saitama holdings.  As such, their financial fortunes—including the realization of future profits—were inextricably tied to the financial fortunes of each other as well as those of the Saitama project leaders.

53.    Pham and other Saitama project leaders offered and sold Saitama to the investing public both to enrich themselves personally, and to collectively fund their efforts to develop the "Saitama ecosystem."

54.    In addition, Saitama investors' financial fortunes depended on the Saitama project leaders' efforts to grow the Saitama ecosystem, including by creating new uses for Saitama such that its utility would increase, thereby increasing the demand for, and correspondingly the price of, Saitama.

55.    Moreover, for each on-chain Saitama transaction, two percent of the value of the transaction was redistributed to Saitama holders in proportion to their Saitama holdings, and another two percent of the value of the transaction was "burned" or destroyed, decreasing the supply of Saitama.[2]  These automatic redistributions of Saitama further ensured that the financial fortunes of the Saitama project leaders (who held large positions in Saitama and were developing uses for the token, including with the proceeds of Saitama sales) and the financial fortunes of

---

[2] "Burning" crypto assets refers to sending those assets to an inaccessible wallet from which the tokens cannot be withdrawn, thereby removing them from circulation.

other investors were intertwined.

56.     *Third*, the Saitama project leaders led Saitama investors to reasonably expect that they would profit from their Saitama investments, based on the Saitama project leaders' entrepreneurial and managerial efforts.

57.     Through the Saitama website, whitepaper, social media, and other public outlets, Pham, Individual 1, and the Saitama Defendants held themselves out as the leaders of the Saitama project and the driving force behind the creation and future development, maintenance, and growth of the Saitama ecosystem from which Saitama derived its value.

58.     In the Saitama whitepaper that the Saitama project leaders published in June 2021, they expressly and repeatedly described Saitama as an investment with the potential for substantial profit while describing themselves as the individuals who would undertake the efforts needed to achieve those profits—specifically, as "a group of committed individuals" that "took over [the Saitama] project and continued developing it."  That development took the form of creating various applications, including those previously described, in which investors could supposedly use and trade Saitama tokens.

59.     Investors were led to reasonably expect not only that the Saitama project leaders' development of these applications would increase demand for Saitama and therefore its price, but also that such uses would lead to additional Saitama transactions.  As described above, each on-chain transaction resulted in a two-percent redistribution to existing Saitama holders and an additional two-percent burn.  From the earliest iterations of their Saitama website and whitepaper, the Saitama project leaders touted these aspects of Saitama as a way for investors to earn passive income on their Saitama holdings.

60.     Beyond their statements on the Saitama website and whitepapers, the Saitama

project leaders periodically explained their ongoing efforts to generate profits for Saitama investors in a series of public "ask me anything" interviews on YouTube, in which investors and potential investors could pose questions to the Saitama project leaders.

61.     On June 25, 2021, Pham moderated one of those interviews and presented extensive information about Saitama.  She was joined by other Saitama project leaders, including Armand, Hernandez, and Kohli.  During that interview, they described their plans for the project, including marketing, product development, and their intention to have Saitama listed on various trading platforms.

62.     At all relevant times, the Saitama project leaders encouraged investors to purchase Saitama, and provided specific instructions on how to do so on the Saitama website.

63.     As a result of the above representations and the economic reality of what Pham and other Saitama project leaders were offering and selling, Saitama investors had a reasonable expectation of profiting from the efforts of Pham and other leaders of the above-described project to develop the Saitama ecosystem and list Saitama on crypto asset trading platforms.

64.     In June and July 2021, Pham sold approximately $69,500 worth of Saitama to the investing public.

**II.     Pham Engaged in Manipulative Trading of Saitama.**

65.     In early July 2021, Pham and other Saitama project leaders were part of a group that engaged in a series of coordinated Saitama purchases intended specifically to:  (1) induce holders of large quantities of Saitama (referred to as "whales") to sell their positions; (2) induce members of the investing public to buy Saitama; and (3) increase the price of Saitama.

66.     The Saitama project leaders were particularly concerned that if the existing "whales" liquidated their Saitama holdings, the price of Saitama would fall, undermining the

Saitama project leaders' efforts to inflate the price of the token and increase the number of Saitama holders.  So the Saitama project leaders sought to buy out these whales through coordinated purchases.  As Pham put it in a private Telegram group chat regarding one such whale:  "[W]e need to lure this idiot to empty his wallet."  Doing so would then enable the Saitama project leaders to inflate the price of Saitama without fear of large holders later cashing out and depressing the price.

67.     The plan worked.  Through their coordinated purchases across numerous wallets in relatively small increments, Pham and other Saitama project leaders successfully induced large Saitama holders to sell their positions while simultaneously attracting new Saitama purchasers.  During their approximately two-day buying spree, the price of Saitama increased by approximately 60 percent.

68.     Pham and other Saitama project leaders described their plan—and their successful execution of it—on July 3 and 4, 2021 in a private group chat on Telegram.

69.     In the private Telegram group chat, Armand explained that he was creating a separate public Telegram "shill group" to promote Saitama to potential investors.  Armand was confident that if he initially populated his "shill group" with some people and "some bots," then "a lot of [people] will join."  He explained:  "If we add this to a pump we create.  A lot of [people] will FOMO in."[3]  Pham asked:  "How much are we gonna pump now?"  Armand responded:  "We will create an illusion of massive buys and new holders. . . .  It'll incite [people] to buy more."  Armand continued, stating the group was "[b]asically creating our own pump through illusion."

70.     Kohli and Tran reported to the group that they were ready to buy, and Individual 1

---

[3]  In this context, "FOMO" or "fear of missing out" refers to investors' "fear" that they may lose out on profiting from an increase in a crypto asset's price.

(the Saitama CMO) demonstrated his agreement with the plan with the following GIF:



71.     Pham, Armand, Kohli, Tran, and Individual 1 continued to discuss the optimal size of their purchases to accomplish the "pump."

72.     The Saitama project leaders coordinated their purchases with Armand's public "shilling" of Saitama on Telegram.  As potential investors joined Armand's public Telegram group, Pham and the rest of the Saitama project leaders each began purchasing Saitama.  Armand instructed them to purchase two to three trillion Saitama per transaction.  Although numerically large, two to three trillion Saitama was small relative to the total initial supply of Saitama, which was approximately 100 quadrillion.  Armand explained, "W[e] want [a] list of small buys to look like it's mor[e] buyers."  Pham, Kohli, Hernandez, Tran, and Individual 1 all began purchasing Saitama at Armand's direction and discussed their transactions in the private Telegram group chat.

73.     For instance, Tran noted that people were joining Armand's public Telegram chat group and told other Saitama project leaders to begin buying immediately.  Armand responded: "Is like fishing with dynamite."  Pham, Tran, and Individual 1 agreed, each responding "Lol." Pham repeatedly emphasized the need for the group to closely coordinate its purchasing (the timing, volume, and number of wallets), in order to maximize its impact on price and to convince the "whales" to sell.

74.     Pham, Individual 1, and all the Saitama Defendants participated in the

coordinated purchases of Saitama, which occurred in multiple rounds over the course of July 3 and July 4, 2021.  Tran, for instance, announced in the private Telegram group chat:  "Round 2 start [sic] now!"  Hernandez responded that he "bought a few times."  Tran later asked the other Saitama project leaders:  "Round 3?"  Armand responded:  "Yea small buys," again advising the Saitama project leaders to make multiple small purchases to create the appearance of broad public interest in Saitama and obscure the fact that a small number of Saitama insiders were responsible for the increased demand.  In response, Pham, Tran, and Kohli each confirmed they were once again buying Saitama.  Pham noted:  "[T]his is where new holders will get attracted . . . and give people confidence."

75.     A few hours later, Armand told Kohli again to keep his purchases small, explaining that "the idea is to keep the [price] chart trending upward to generate traction and stability[.]  Will keep [people] from wanting to sell and will instead buy more."  Kohli indicated he understood the plan:  "Gaaaaat it."

76.     The Saitama project leaders discussed in their private Telegram group chat how their coordinated purchases were in fact succeeding in inducing new investors to purchase Saitama.  Relatively early in their efforts, Armand reported that their purchases were increasing the number of Saitama holders:  "Soooo success so far."  Hernandez agreed:  "[Y]es holder increase is pretty steady."  Armand later reported to the group:  "Holders are increasing nicely and distribution is looking much better.  We have a better foundation today then [sic] we did last week from the eyes of a future investor."  Kohli responded:  "And sell again on high what we created."

77.     Armand apprised the group of the status of their efforts, stating for example, "We've already bled out most of the big wallets[;] there's only a couple that remain."  After a

few hours of continued coordinated purchases by leaders of the Saitama project, Armand reported that one of the wallets they targeted sold roughly 800 trillion Saitama, leading Armand to conclude:  "Mission semi-accomplished."

78.    The Saitama project leaders recognized the need to hide their coordinated purchases from the investing public not only by breaking their Saitama purchases into small transactions, but also by using multiple wallets to disguise their coordinated activity.  For example, after making a series of Saitama purchases, Kohli asked others in the private group chat whether he should use another account, noting "all from same looks weird."  The Saitama CMO responded:  "Yes . . . Use two or 3 wallets."  Later, Kohli commented, "I think too many from my address wallet," referring to the number of Saitama purchases he made from the same wallet address.  Armand replied, "Yea need new wallet."

79.    The Saitama project leaders understood that they needed to keep their coordinated purchases hidden from the investing public.  Kohli, for instance, warned the participants in the private Telegram group chat:  "Don't involve too many in group. . . .  It will really bring downfall if someone take screen shot and start posting."

80.    After two days of coordinated purchases of Saitama that eliminated many large wallets and expanded the number of Saitama investors, Armand complimented Pham and the rest of the Saitama project leaders:  "Ladies and gentlemen that is how you start a hype.  Perfectly executed well done all[.]  Still have to keep small buys incoming if it pulls though.  Lot of ppl [people] watching chart right now."  Later in the day, after continued discussion of their manipulation of Saitama, Tran posted to the group:



81.     Later in the conversation, Individual 1 (the Saitama CMO) added:



82.     Working in the manner and for the specific purposes described above, Pham purchased approximately 258.81 trillion Saitama for approximately $8,859.

**ROBO INU**

83.     The Robo Inu token is an ERC-20 standard token on the Ethereum blockchain, with ticker symbol RBIF.

84.     In or around November 2021, Pham and other leaders of the Robo Inu project began promoting the Robo Inu token on a website and through several social media and communications platforms, including X (formerly Twitter), YouTube, Reddit, and the publishing platform Medium.  All of these communications were aimed at the investing public, including investors in the United States.

85.     Across these platforms, Pham and other project leaders encouraged others—sometimes expressly referred to as "investors"—to purchase the token based on, among other things, Robo Inu's "tokenomics" (aspects of a crypto asset's design, including transaction fees imbedded into the smart contract) and the efforts of Pham and others to undertake a project to

generate value for Robo Inu investors.

86.     Pham also published a whitepaper describing what the project would entail—efforts of her and her leadership team to create an "ecosystem" of products and services that would rely on or utilize Robo Inu, all of which were purportedly designed to maximize value for Robo Inu investors.  At that time, the Robo Inu token was available for trading on the Uniswap trading platform.

87.     In or around February 2022, Robo Inu was made available for trading on the Bitmart trading platform.

88.     In addition to promoting the token on social media, leaders of the Robo Inu project team continued to update its website and develop the white paper over time.  According to the June 2022 version of the whitepaper, the Robo Inu ecosystem included the following projects, some of which then remained under development:

  a.  a crypto asset wallet called "RGI Wallet";

  b.  an "incubator for potential projects with real use cases" that are "checked and moderated by the Robo Inu Finance Team" called "RoboLaunchpad";

  c.  a platform for trading so-called non-fungible tokens ("NFTs") called "RoboNFT Marketplace";

  d.  a platform called "RoboDAO" on which Robo Inu holders could vote on governance proposals related to Robo Global;

  e.  a crypto asset trading platform called "RoboEx";

  f.  a venture fund called RoboVentures, which, as Pham explained in a Medium post, "will invest into SpaceX and TSLA stocks to allow $RBIF token holders to earn a piece of that space pie."

89.     Over time, Pham and her leadership team launched several of these products, including RGI Wallet, RoboDAO, and RoboEx.

**III.     Pham Engaged in Unregistered Offers and Sales of Robo Inu.**

90.     At all relevant times, Robo Inu was offered and sold as a security, specifically an investment contract.

91.      *First*, Robo Inu purchasers, including those who bought it on crypto asset trading platforms such as Uniswap and Bitmart, invested money—specifically U.S. dollars, Bitcoin, or ETH—when they purchased Robo Inu.

92.     *Second*, Robo Inu purchasers invested in a common enterprise with each other and with Pham, Robo Global, and other Robo Inu project leaders, who at all relevant times retained significant Robo Inu holdings.  Because the value of Robo Inu tokens rose or fell together for all holders, all Robo Inu holders profited or suffered losses in amounts proportional to their Robo Inu holdings.  As such, their financial fortunes—including the realization of future profits—were inextricably tied together, including to the financial fortunes of Robo Global, Pham, and other Robo Inu project leaders.

93.     In addition, Robo Inu investors' financial fortunes depended on Pham and other project leaders' ability to grow the Robo Inu ecosystem, including by developing applications that Pham had publicly claimed would "bring the token higher and higher."  If Pham and other leaders of the Robo Inu project were able to create new uses for Robo Inu, its utility would increase, thereby increasing the demand for (and, correspondingly, the price of) Robo Inu.

94.     Moreover, according to the Robo Inu whitepaper, each Robo Inu purchase or sale was subject to a "tax" designed "to fuel the growth of Robo Inu Finance's ecosystem."  Specifically, all Robo Inu on-chain purchases were subject to a four-percent tax, with one

percent redistributed to Robo Inu holders in proportion to their Robo Inu holdings, and three percent transferred to a Robo Inu marketing wallet that Pham could use to promote Robo Inu. Similarly, all Robo Inu on-chain sales or transfers were subject to a ten-percent tax, with three percent redistributed to Robo Inu holders in proportion to their Robo Inu holdings, and seven percent transferred to a Robo Inu marketing wallet.[4]  These automatic redistributions of Robo Inu further ensured that the financial fortunes of Pham and other project leaders (who held large positions in Robo Inu and were purporting to use proceeds from additional sales to develop uses for the token) and the financial fortunes of other investors were intertwined.

95.     *Third*, Pham led Robo Inu investors to reasonably expect that they would profit from their Robo Inu investments, based on the entrepreneurial and managerial efforts of Pham and other leaders of the Robo Inu project.

96.     Through the Robo Inu website, whitepaper, social media, and other public outlets, Pham held herself out as the leader in charge of the Robo Inu project and the driving force behind the creation of the ecosystem from which Robo Inu derived its value.  As Pham posted on Reddit:  "My mission is very simple *To Finish What I started, and create wealth for many* . . . . We are in this just for one reason- W.E.A.L.T.H." (emphasis original).  On X, she wrote:  "Buy RBIF and retire[.]"  In another Reddit post, Pham wrote:  "My goal is still 1bil MC [market capitalization,] and I will not let anything or anyone get in my ways [sic] . . . .  I can guarantee you that you will never regret walking down this journey with me."

97.     Pham also set forth a plan in the June 2022 Robo Inu whitepaper to grow the utility and value of the token in phases that were tied to the number of Robo Inu investors.

---

[4]  In or around July 2023, Robo Inu migrated to Version 2, which altered the tax and redistribution structure, but still retained a five-percent tax on on-chain all sales, from which one percent was redistributed pro rata to existing Robo Inu holders.

Those phases included, among other things, various new product launches (including some of the products identified above), listing Robo Inu on additional crypto asset trading platforms, and "[a]ggressive [m]arketing."

98.     Investors were led to reasonably expect not only that Pham's development of these products would increase demand for Robo Inu and therefore its price, but also that such efforts would lead to additional Robo Inu transactions (as Pham and other project leaders increased the number of ways the token could be used), which, as described above, would result in additional distributions of proceeds to existing Robo Inu holders.

99.     This redistribution enabled Pham to promote Robo Inu as a passive investment vehicle in which investors could profit simply through buying and holding Robo Inu.  As she posted on Reddit on November 27, 2021:  "The more you hold the more you get."  On January 16, 2022, she explained on X to potential investors that among the "things you will gain from buying and holding #RoboInu $RBIF 🔥 🔥 🔥" is "reflections as passive income," referring to the one- or three-percent redistribution (or "reflection") awarded to existing token holders.

100.     Pham's pitch of Robo Inu to potential investors was not subtle.  For example, on March 1, 2024, Pham posted on her personal account on X:  "Come and support us #RoboInu $RBIF.  Promise you will get rich."

101.     In speaking to investors, Pham expressly tied her work in developing applications for Robo Inu to its growth and value.  On October 3, 2022, for example, she wrote to the Robo Inu community on Reddit:  "I am still here, personally involving [sic] in every single meeting of developments to make sure we are in sync . . . .  What can't change is us, dev [development] team, our commitment to deliver what we need to."  Similarly, on March 1, 2024, she posted on X:  "Still have chance to accumulate $RBIF . . . #RGIWallet and #RoboEx are ready to bring the

token higher and higher."

102.    Pham also led investors to reasonably expect to profit from their Robo Inu investments by publicly touting the results of her efforts to have Robo Inu listed on multiple trading platforms, where investors would be able to sell their Robo Inu.  Robo Inu initially traded on Uniswap, then on Bitmart for a certain period, and finally on RoboEx, the platform created by Pham and other leaders of the Robo Inu project.  At all relevant times, Robo Inu was available to United States investors on those trading platforms.

103.    As a result of the above and other representations and the economic reality of what Pham was offering and selling, Robo Inu investors had a reasonable expectation of profiting from Pham's efforts to develop the Robo Inu ecosystem.

## IV.    Pham Hired Gotbit to Artificially Inflate Robo Inu's Trading Volume.

104.    Beginning in or around February 2022, Pham and the other leaders of the Robo Inu project initiated a private Telegram group chat with several Gotbit employees, including Kedrov, "Vladislav Trader," "Vladimir," and "Kavi JLL," among others, to solicit their market manipulation services.

105.    Pham stated in the group chat that, despite having spent $250,000 on "marketing," the response from investors had not been "satisfactor[y]," so she and her team were "thinking about increasing the volume via MM" (i.e., a "market maker").

106.    Pham said in the group chat that the purpose of hiring Gotbit to increase and maintain trading volume was "to attract people to the [Robo Inu] token."  Gotbit personnel confirmed they understood that this was the purpose.  Throughout the parties' relationship, various individuals representing Gotbit communicated with Pham and other leaders of the Robo Inu project about ways to create investor "FOMO" through artificial trading volume.  For

example, one of Gotbit's employees on the Telegram group chat, "Vladislav Trader," stated that he was "trying to trigger organics"—i.e., individuals or entities other than Gotbit—"to buy Robo Inu.

107.    Between approximately February 2022 and June 2023, Pham and others working with her paid Gotbit approximately $3,000 to $6,000 per month to, among other things, manipulate the trading volume of Robo Inu through automated wash trading on Bitmart and through automated buying and selling on Uniswap.  Gotbit told leaders of the Robo Inu project that it would be using a trading "bot," an automated crypto asset trading program, to execute this manipulative trading.

### A.       Gotbit Artificially Inflated Robo Inu's Trading Volume on Bitmart.

108.    To facilitate manipulative trading on Bitmart, Pham and other Robo Inu project leaders, at Kedrov's request, provided Gotbit with a supply of both Robo Inu and USDT (or "Tether"), another crypto asset.  Gotbit used this supply of Robo Inu and Tether to trade with itself—not to meet organic investor demand—and to artificially inflate the trading volume to whatever level Pham and her associates desired.

109.    In February 2022, Kedrov told Pham and other Robo Inu project leaders in their private Telegram group chat that Gotbit could achieve "[a]ny volume you want."  Kedrov recommended that Robo Inu start with $200,000 in artificial daily volume.

110.    On multiple occasions, Gotbit personnel in the Telegram group chat confirmed that its manipulative trades accounted for most of the observed Robo Inu trading volume that was reported to websites that investors use to track crypto assets, such as CoinMarketCap and CoinGecko, which compile trading data from crypto asset trading platforms, including Uniswap, Bitmart, and many others.

111.    For instance, in April 2022, "Vladimir" posted to the group chat that Gotbit "did about 250k per day average volume at current price," and that that volume was generated "only by our MM," meaning that Gotbit was trading about $250,000 of Robo Inu per day with itself— not other market participants—creating the false impression of organic buying and selling.

112.    Similarly, in June 2022, "Vladimir" again indicated to Robo Inu project leaders in the group chat that the observed trading volume was "mostly . . . our [i.e., Gotbit's] volume."

113.    In late March 2023, "Vladislav Trader" posted to the group chat that "organic" volume accounted for less than 10 percent of Robo Inu's total trading volume.  The rest was Gotbit trading with itself through automated wash trading.

114.    Gotbit generally maintained a stable floor of artificial trading volume on Bitmart at the direction of the leaders of the Robo Inu project.  The parties agreed to increase that artificial trading volume ahead of news announcements or other marketing efforts by Pham and other Robo Inu project leaders.  For example, in March 2022, in response to Pham previewing Robo Inu news events for Gotbit, "Vladimir" stated that he had "slightly increased the volumes on Bitmart before the announcements."

115.    Similarly, in December 2022, a leader of the Robo Inu project posted to the group chat:  "We'll have a trending campaign on CG [i.e., CoinGecko] and CMC [i.e., CoinMarketCap] tomorrow, it starts around 4-6pm UTC.  So please increase the volume once the campaign starts."  Kedrov responded:  "Awesome news, sure - we start increasing the volume smoothly!"

116.    These trades were intended to mislead the investing public to believe that the market was reacting positively to Robo Inu news and/or the information conveyed in Robo Inu marketing.

117.    In several instances, Pham and her associates directed Gotbit to significantly increase the daily trading volume of Robo Inu, sometimes above $1 million.  Gotbit attempted to execute these manipulations in a manner that would disguise the fact that nearly all the trading volume was artificial.

118.    For instance, on February 25, 2022, Pham posted to the group chat with Gotbit a request to "slowly increase the volume" because she was attempting to get the "token trending on cmc" i.e., CoinMarketCap.  Gotbit employee "Vladimir" responded:  "Yeah we can increase more volume gradually[.]  But it is important that our market looks organic."

119.    Similarly, in January 2023, one of Pham's associates posted to the group chat with Gotbit:  "[C]an you raise the volume on Bitmart please, above 1.1mil daily!  Thank you very much."  Kedrov responded:  "Sure, will be done."  But another Gotbit employee cautioned against inflating the trading volume to $1.1 million all at once:  "Yesterday I already raised volume above 120k, I suggest not to put 1.1 million at once, and raise it step by step, for example, tomorrow make 200k and in couple days 300 and so on, this has to be done because CMC [i.e., CoinMarketCap] itself can detect suspicious activity in the market and exclude volumes from bitmart."

120.    The purpose of this wash trading was always the same—to use the artificial trading volume to lure investors to buy Robo Inu.  Some of these increases in trading volume lasted days and occurred alongside Pham's efforts to promote Robo Inu to the investing public.  Additional examples of this volume manipulation are summarized below.

**B.    March 5 - 9, 2023:  At Pham's Direction, Gotbit Artificially Inflated Robo Inu's Daily Trading Volume Above $1 Million.**

121.    On March 5, 2023, Pham sought to generate interest in Robo Inu by having it appear on CoinMarketCap as one of the "most viewed" crypto assets by visitors to that website.

27

122.     To accomplish this, Pham hired an individual she referred to as "Lara" to increase Robo Inu's viewership rankings on CoinMarketCap.  Pham and "Lara" communicated via a private Telegram chat that was separate from Pham's group chat with Kedrov and other Gotbit employees.  In that separate, private chat, "Lara" told Pham that if Robo Inu's daily trading volume reached $1 million, she could inflate Robo Inu's viewership rankings for a fee of $500.

123.     Robo Inu's daily trading volume was, at the time, less than $200,000—and most of that volume consisted of Gotbit trading the token with itself.  Pham responded to "Lara" that she would "check with our MM [market maker]" to see if it could artificially inflate Robo Inu's 24-hour trading volume to $1 million.

124.     Pham immediately messaged the Gotbit Telegram group chat:  "How much and how long will it take for us to raise the volume on bitmart to 1mil?"  "Vladislav Trader" responded:  "I can do it in a [sic] ~6 hours, it will cost about 200$."

125.     Pham reported this information to "Lara" ("Just now my mm said they will help increaae [sic] vol to 1mil in 6 hour").  "Lara" stated she would need Robo Inu's trading volume to remain at $1 million for about 8 to 12 hours in order to manipulate the asset's place on CoinMarketCap's "most viewed" rankings.

126.     Pham immediately returned to the Gotbit Telegram group chat:  "Can we start now?  When will it get to 1mil" in trading volume?  Gotbit's "Vladislav Trader" confirmed he could begin increasing Robo Inu's trading volume immediately.  Pham asked if he still needed 6 hours to accomplish the inflation, and "Vladislav Trader" responded that he could "try faster, but at least need[ed] about 3-4 hours."

127.     At approximately 8:48 a.m. on March 6th, "Vladislav Trader" reported Gotbit was

"starting" the volume manipulation.[5]  At the time of this exchange, Robo Inu's cumulative 24-hour trading volume was approximately $213,800.[6]

128.     Over the next several hours, "Lara" and Pham continued to monitor Robo Inu's 24-hour trading volume.  By 2:04 p.m. that day, "Lara" told Pham "We are above 1m," and Gotbit separately reported to Pham that the "volume" was "done."

129.     Pham initially decided to maintain the inflated trading volume and the manipulated viewership rankings for about 24 hours, having consulted with both "Lara" and Gotbit on these issues.  At approximately 1:48 a.m. on March 7, 2023, Pham instructed Gotbit to "please make sure we have 1mil volume for the next 24 hours or so," noting that Robo Inu had been trending as one of the most viewed tokens on CoinMarketCap for several hours.  Around the time of this exchange Robo Inu's 24-hour trading volume had reached over $1.7 million—more than 8 times the 24-hour trading volume before Pham's request.

130.     Later that morning, at approximately 4:52 a.m., "Vladislav Trader" reported to Pham that he had spent $380 thus far and had increased Robo Inu's trading volume to $1.9 million.  Consistent with Gotbit's description, public market data indicate that Robo Inu's 24-hour trading volume was in fact just above $1.9 million at the time.  Gotbit recommended that Pham reduce the 24-hour trading volume to $1.1 million at a cost of $220 per day.

---

[5]  All times are approximate.  Unless otherwise indicated, all times are either EST or EDT depending on the communication date.

[6]  Unless otherwise indicated, all price and trading volume data was obtained from public sources including CoinGecko.com and/or CoinMarketCap.com.  These are the sources that the leaders of the Robo Inu project regularly consulted and promoted to Robo Inu investors.  Each hour of the day, CoinGecko provides a cumulative total of the trading volume for the preceding 24 hours.  Here, for example, the publicly available data on CoinGecko indicated that as of 8:00 a.m. on March 6, 2023, the cumulative trading volume over the preceding 24 hours (i.e., the total trading volume from 8:00 a.m. on March 5, 2023, to 8:00 a.m. on March 6, 2023) was approximately $213,800.  This cumulative 24-hour total is referred to herein as the "24-hour trading volume."

131.    "Vladislav Trader" asked how high Robo Inu ranked on CoinMarketCap's most viewed listing:  "By the way, what place in trending have we reached?"  Pham responded that Robo Inu had reached "8th," meaning that Robo Inu was the eighth most-viewed crypto asset on CoinMarketCap.

132.    Around 11:49 a.m., Pham, continuing the Telegram group chat, asked Gotbit to continue pumping Robo Inu's trading volume for another day.  "Vladislav Trader" responded: "Okay, do you want to maintain 2M or 1.1M will be enough?"  Pham replied:  "No 1.1M is enough[.]  We just need to stay on most viewed page."  "Vladislav Trader" stated he would maintain that volume, and Pham sent him a link to CoinMarketCap's "most viewed" page. "Vladislav Trader" noted that he had just checked the website and confirmed Robo Inu's place in CoinMarketCap's rankings.  At the time of this exchange, Robo Inu's 24-hour trading volume was nearly $1.9 million; it began to fall steadily thereafter, as directed by Pham.

133.    On March 7, 2023, at 10:21 p.m., Pham asked Gotbit to "please maintain the volume," noting that she planned to "do a twitter space" the next day at 7 p.m.[7]

134.    "Vladislav Trader" confirmed that he was "maintaining 1.1M as promised." Around the time of these messages, Robo Inu's 24-hour trading volume was roughly $1.2 million.  The purpose of maintaining this level of artificial trading volume was to mislead investors to believe there was substantial market interest in Robo Inu while Pham was promoting it to current and potential investors.

135.    On March 8, 2023, at 9:32 p.m., following her Twitter Space event, Pham instructed Gotbit:  "Let's bring down the volume to normal . . . [S]lowly reduce over the next

---

[7] Twitter spaces (now "X Spaces") are live audio events hosted on the social media platform.  Pham used these to promote Robo Inu to the investing public.

days."  Robo Inu's 24-hour trading volume around the time of her message was roughly $1.29 million.

136.    A few hours later, at 12:09 a.m. on March 9, 2023, "Vladislav Trader" responded: "Hey, okay, I have changed the settings of our bot."  After Gotbit "changed the settings of [its] bot," Robo Inu's 24-hour trading volume steadily dropped from roughly $1.5 million to about $213,000 the next day—an artificial floor of wash trading that Gotbit had previously set.

137.    This example of the manipulation of Robo Inu's trading volume, orchestrated by Pham and executed by Gotbit from March 5 to March 9, 2023, is summarized in the chart below.

### Robo Inu 24-Hour Trading Volume:  March 6 - 10, 2023



138.    Following this trading volume spike, Pham asked Gotbit in the private Telegram group chat whether there is "a tool for people to know this is not organic volume."  "Vladislav Trader" replied that "ordinary users can not accurately determine whether these transactions are

made by our bot, only by indirect signs, which we try to make as organic as possible."

139.    Pham followed up by asking whether an "investment fund" as opposed to an ordinary user would "be able to identify whether this [trading] is organic or bot?"  "Vladislav Trader" responded that there was no tool that could conclusively establish that "these volumes are not organic," noting that, while other traders might assume the trading volume "was done by a bot," Gotbit "make[s] it so that it is not very noticeable," such as by not "mak[ing] trades with the same amounts" and not "mak[ing] the same volume candle."[8]

### C.    May 21 - 27, 2023:  At Pham's Direction, Gotbit Artificially Inflated Robo Inu's Daily Trading Volume Above $1 Million.

140.    In late May 2023, again working at Pham's direction, Gotbit engaged in wash trades to create a spike in Robo Inu's trading volume, so that Pham could once again cause Robo Inu to "trend[]"—as she put it—on CoinMarketCap.  Pham provided a series of instructions to Gotbit, which they executed to inflate Robo Inu's 24-hour trading volume by a factor of 10 in a matter of hours.

141.    On May 21, 2023, at 12:21 a.m., Pham messaged Gotbit via the private Telegram group chat:  "Please help me to increase the volume slowly."  She continued:  "Target to hit 1mil and above tomorrow about 9am PST.  Maintain vol of 1mil and above throughout the day until I say to stop.  Thank you."  At 3:27 a.m., "Vladislav Trader" responded:  "Hello, okay no problem, starting now."  At that time, Robo Inu's 24-hour trading volume was less than $100,000.

142.    Over the course of the day, Gotbit slowly increased Robo Inu's trading volume

---

[8]  A "candle" is a graphic snapshot of whether the market price of a security moved positively or negatively and to what degree.  The "candlestick" measures the opening and closing prices during a given timeframe, and the "wick" measures the highest and lowest prices.  A "green candle" shows that a security's market price has increased during the relevant period, whereas a "red candle" shows that a security's market price has decreased during the relevant period.

through automated wash trading.  At approximately 10:00 p.m., Robo Inu's 24-hour trading volume had risen to approximately $345,000.

143.    Unsatisfied with the progress Gotbit had made, at 10:22 p.m., Pham instructed Gotbit:  "Pls increase the volume to 1mil."  "Vladislav Trader" replied:  "Hello!  I will do it."  Less than two hours later, at 12:00 a.m. on May 22nd, Robo Inu's 24-hour trading volume was more than $1.4 million.

144.    Gotbit maintained that inflated 24-hour trading volume until 12:00 a.m. on May 23rd, when its large spike in wash trading (from 12:00 a.m. the day before) rolled off the cumulative 24-hour trading total, causing that cumulative total to drop to approximately $623,000.  Robo Inu's 24-hour trading volume continued to fall steadily to roughly $209,000 by 6:00 p.m.

145.    At 6:15 p.m., Pham asked both "Vladimir" and "Vladislav Trader":  "Why dont [sic] maintain the volume?  I hvnt [sic] said stop though."  "Vladislav Trader" explained that he had lowered the wash-trading volume "cause organic sellers tried to sell into our bot," but agreed to "increase it back fast."

146.    Gotbit then ramped up its automated wash trading, pushing the 24-hour trading volume to more than $875,000 by 8:00 p.m.

147.    At 11:26 p.m., Gotbit reported to Pham that Robo Inu's trading volume was $1.15 million.  Gotbit maintained Robo Inu's 24-hour trading volume at more than $1 million (generally between $1.1 and $1.4 million) until the evening of May 24, 2023.  At that point, at the request of Pham and another leader of the Robo Inu project, Gotbit agreed to slowly reduce the trading volume.

148.    Over the next hour, Gotbit reduced the 24-hour trading volume from more than $1

million to approximately $740,000.  Gotbit then slowly reduced its wash trading further

throughout May 26, 2023.  By 1:00 a.m. on the morning of May 27, 2023, the 24-hour trading

volume was approximately $102,000.

     149.    This example of the manipulation of Robo Inu's trading volume, orchestrated by

Pham and executed by Gotbit from May 21 to May 27, 2023, is summarized in the chart below.

**Robo Inu 24-Hour Trading Volume:  May 21 - 27, 2023**



V.    **Gotbit Artificially Inflated Robo Inu's Trading Volume on Uniswap.**

     150.    Pham also sought to have Gotbit increase Robo Inu's daily trading volume by

buying and selling Robo Inu tokens in roughly equal proportion on Uniswap.  This artificial

trading was intended to create the false impression that a robust market existed for Robo Inu on

Uniswap.  Leaders of the Robo Inu project and Gotbit both believed that this artificial trading

would, in turn, encourage the investing public to trade Robo Inu.

151.    Gotbit started its manipulative trading on Uniswap on or about March 18, 2022.

152.    This trading served no legitimate economic purpose.  It was designed and intended to give the appearance to unsuspecting, would-be Robo Inu investors that Robo Inu's trading volume was robust across trading platforms.  The lack of economic purpose is demonstrated, in part, by the steep cost in Ethereum network fees—which are required to conduct transactions on the Ethereum blockchain—that Gotbit incurred to engage in these trades on Uniswap, only to end up with a low net position in Robo Inu.

153.    To minimize these Ethereum network fees, often called "gas," Gotbit decided to keep the number of daily transactions low, which necessitated increasing the size of each trade in order to reach the daily trading volume target Gotbit set with Pham.  A consequence of this manipulative trading strategy was large swings in Robo Inu's price on Uniswap.  These price swings were visible to the investing public, which could view Robo Inu's price and trading volume in real time in graphs and charts available on websites such as CoinMarketCap, CoinGecko, and DEXTools.

154.    Gotbit and Pham watched those graphs and charts closely.  Pham was concerned that Gotbit's volume pumping strategy caused the "chart" to "look[] unnatural" and could drive away investors instead of luring them to buy Robo Inu.

155.    Below is a March 19, 2022 excerpt from the private Telegram group chat involving Pham and several Gotbit employees, among others.  In this excerpt, Pham and Gotbit discussed their intention to inflate the volume of daily trading on Uniswap to draw new investors to Robo Inu; the difficulty of doing so without incurring substantial network fees; and their desire to have the trading appear to be organic to the investing public, and not the result of Pham

hiring a purported "market maker" to buy and sell in roughly equal amounts every day to create the appearance of market interest in Robo Inu:

| Time | From | Text |
|---|---|---|
| 3:16 pm | Pham | So the plan is for the volume to hit 300k then we hold off? Or how's your plan like? |
| 3:21 pm | "Vladimir" | As I understand it, you wanted to show a stable daily volume, this is what we are doing now<br><br>But on the other hand, because of this, the graph does not look very good. This is corrected by reducing transactions and increasing their number, but then there will be very expensive gas costs |
| 3:22 pm | Pham | So what is your advice?<br><br>We are not experienced in MM<br><br>How to achieve both lols<br><br>Volume and chart steadily |
| 3:29 pm | "Vladimir" | This can only be achieved by increasing the number of transactions, but it will be unreasonably expensive for us I don't really like the current chart because of the large number of jerks<br><br>We may have to reduce the size of each transaction and, accordingly, the volumes, but at the same time leave the current gas costs and the number of transactions |
| 3:30 pm | "Vladimir" | In my opinion chart looks unnatural now |
| | | * * * |
| 4:02 pm | Pham | How can we make things better?  The purpose of this is to attract people to the tokens.  As we have marketing and things like that ongoing, due to the low volume, it may turn people away :( which we have been struggling to overcome |
| | | * * * |
| 4:02 pm | Pham | As you said the chart looks unnatural makes me worried too |

| Time | From | Text |
|------|------|------|
| 4:03 pm | "Vladimir" | Most of pretty big projects don't have too high volume on uni[swap] and it's normal |
| 4:04 pm | "Vladimir" | Now we have good vol[ume] but our chart looks repulsive |
| | * * * | |
| 4:45 pm | "Vladimir" | We can change settings like amount of tokens, buy percent (50/50 buy/sell now), how much transactions per period (3-4/180 min now) |
| 4:46 pm | Pham | Can we do this in a natural way? |
| 4:46 pm | Pham | As the current setting is too aggressive |
| 4:46 pm | Pham | And it's literally not only causing fear but also the charting itself |
| 4:47 pm | "Vladimir" | Yes of course but as I told before this will cost too much in network fees |

156.    During this time, in March 2022, Gotbit was conducting automated buying and selling in roughly equal measure on Uniswap 3-4 times every three hours (or approximately once per hour).  Although, as Pham said, this manipulative trading was expressly intended "to attract people to the tokens," the high "gas" fees caused Gotbit to avoid executing a large number of small transactions, which would have been more likely to suggest to investors a robust market for Robo Inu.  Instead, Gotbit executed a smaller number of larger transactions.

157.    As "Vladimir" explained to Pham:

We always want to provide the best service for our clients, for this reason we did not want to do mm ["market making"] on uni[swap], because it is very expensive and not profitable[.]  We tried to minimize network fees by reducing the number of transactions, but chart is getting worse[.]  We can maintain a nice and neat chart for you with a large number of small transactions, but it will be too expensive due to network fees[.]

## VI.    At Pham's Direction, Gotbit Manipulated Robo Inu's Price.

158.    In addition to artificially inflating the trading volume of Robo Inu, Gotbit also manipulated the price of Robo Inu.

159.    For instance, on March 8, 2023, Pham asked Gotbit to calculate how much it would cost to increase the price of Robo Inu by 30 percent.  After Gotbit replied that it would cost more than $19,000, one of Pham's associates responded:  "OK let us try."

160.    Members of Robo Inu's leadership team then set about pumping up Robo Inu's price on Uniswap, while Gotbit simultaneously pumped Robo Inu's price on Bitmart.  Publicly available price data indicate that, in the hour that this exchange took place, the price of Robo Inu increased approximately 30.8 percent.

## VII.   Pham Planned to Further Manipulate the Price and Trading Volume of Robo Inu Though a Series of Coordinated Purchases Before Law Enforcement Intervened.

161.    In or around February 2024, Pham decided to inflate the price of Robo Inu by coordinating a series of purchases by a group of investors and project participants.  It was essentially the same plan she had executed with other leaders of the Saitama project in July 2021 to inflate the price of Saitama.

162.    On February 8, 2024, Pham created a private group chat on Telegram with Individual 2 and Hernandez, whom Pham introduced to Individual 2.  The purpose was to discuss plans to manipulate the price and trading volume of Robo Inu, among other things.

163.    On February 9, 2024, Individual 2 sent a message to the group:  "What RBIF needs now is trading volume and more holder growth to break out."

164.    On February 12, 2024, Hernandez responded that Pham "and myself definitely know this from the Saitama days as with out [sic] volume there is no hype, movement or fomo so to speak."  Individual 2 stated that he agreed with Hernandez and that "a project without volume

38

will die day by day; new investors will only look at volume to decide whether to invest or not." Individual 2 suggested either creating a "bot" to "pump price, draw beautiful charts, increase volume appropriately" or to hire a "market maker" to do the same.

165.    Pham stated that the plan was to "instil[l] the hype and fomo elements" as had previously been done "successfully at saitama," referring to the manipulation of Saitama's price through coordinated purchases in July 2021.

166.    On February 13, 2024, having discussed various technical issues regarding the Robo Inu ecosystem, Pham told the group:  "Next step is to hype and pump."

167.    On February 16, 2024, Pham touted her affiliation with Saitama on X, asserting that she had previously led the "#SaitamaWolfPack," and stated:  "[L]et's watch everything slowly unfold in the coming weeks/months and what the right leadership with passion can do and maybe I will make that history again."

168.    Meanwhile, Pham began contacting others to participate in her scheme to manipulate the price of Robo Inu.

169.    On February 27, 2024, Pham, Individual 2, Hernandez, and others participated in a video call during which Pham and Individual 2 discussed their plans to manipulate the price of Robo Inu through a series of coordinated purchases.

170.    A purported venture capital investor on the call stated to Pham and Individual 2: "It sounds like you have a plan in place basically to run back kinda like the Saitama playbook. Coordinated buys you spread them across the wallets.  Obviously, that's key to pushing the volume and the price, attracting new buys, we love that plan."  The purported investor then asked:  "I was just wondering what is your timeline looking like for this?"

171.    Pham responded, "We are already ready" and reiterated that the plan was "push

the volume" and cause "FOMO and the, you know, the hype."

172.     In early March 2024, Pham contacted several individuals to enlist their involvement in coordinated purchases to pump up the price of Robo Inu.

173.     Law enforcement intervened to prevent Pham from executing her plan to manipulate the price of Robo Inu.

### FIRST CLAIM FOR RELIEF
### UNREGISTERED OFFERINGS OF SECURITIES
**(Violations of Sections 5(a) and 5(c) of the Securities Act)**

174.     Paragraphs 1 through 173 above are re-alleged and incorporated by reference as if fully set forth herein.

175.     At all relevant times, Saitama and Robo Inu were each offered and sold as a security under Section 2(a)(10) of the Securities Act [15 U.S.C. § 77b(a)(10)].

176.     By reason of the conduct described above, the Defendant, directly or indirectly: (i) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (ii) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

177.     As a result, the Defendant violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)] and will continue to violate those sections unless enjoined.

## SECOND CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES
### (Violations of Sections 17(a)(1) and (3) of the Securities Act)

178.    Paragraphs 1 through 173 above are re-alleged and incorporated by reference as if fully set forth herein.

179.    At all relevant times, Saitama and Robo Inu were each offered and sold as a security under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

180.    By reason of the conduct described above, Defendant, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently (i) employed devices, schemes, or artifices to defraud and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

181.    By reason of the conduct described above, Defendant Pham violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §§ 77q(a)(1) and (3)] and will continue to violate those sections unless enjoined.

## THIRD CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
### (Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c))

182.    Paragraphs 1 through 173 above are re-alleged and incorporated by reference as if fully set forth herein.

183.    At all relevant times, Saitama and Robo Inu were each offered and sold as a security under Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

184.    By reason of the conduct described above, Defendant, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of

interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

185.    By reason of the conduct described above, Defendant violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a) and (c)] thereunder and will continue to violate those provisions unless enjoined.

**FOURTH CLAIM FOR RELIEF**
**MARKET MANIPULATION**
**(Violations of Section 9(a)(2) of the Exchange Act)**

186.    Paragraphs 1 through 173 above are re-alleged and incorporated by reference as if fully set forth herein.

187.    At all relevant times, Saitama and Robo Inu were each offered and sold as a security under Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

188.    By reason of the conduct described above, Defendant Pham, directly or indirectly, effected a series of transactions in a security not registered on a national securities exchange, creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

189.    By reason of the conduct described above, Defendant Pham violated Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)] and will continue to violate that section unless enjoined.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A.      Enter a permanent injunction restraining the Defendant, her agents, servants, employees and attorneys, and those persons in active concert or participation with her who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a) and (c), and 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77e(a) and (c); 77q(a)(1) and (3)], and Sections 9(a)(2) and 10(b) of the Exchange Act [15 U.S.C. §§ 78i(a)(2) and 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

B.      Order Defendant to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint pursuant to Sections 21(d)(5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and (7)];

C.      Order Defendant to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

D.      Enter an order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] barring Defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

E.      Enter an order prohibiting Defendant from participating, directly or indirectly, including but not limited to through any entity controlled by her, in any offering of securities, including any crypto asset security; provided however, that such injunction shall not prevent her from purchasing or selling securities, including crypto asset securities, for her own account.

F.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

G.      Grant such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

The Commission demands a jury in this matter for all claims so triable.

DATED:  October 9, 2024.

Respectfully submitted,

*/s/ David J. D'Addio*
David J. D'Addio (Mass. Bar No. 665790)
Amy Harman Burkart (Mass. Bar No. 651828)
Ivan Panchenko (Mass. Bar No. 693552)
Jeffrey Cook (Fla. Bar No. 647578)
Joy Guo (N.Y. Bar No. 5294764)

SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone:  (617) 573-4526 (D'Addio direct)
Fax:  (617) 573-4590 (fax)
daddiod@sec.gov (D'Addio email)